# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

JENNIFER E. WHEAT

**Plaintiff,**

v.

TANGIPOHOA PARISH SCHOOL BOARD

**Defendant.**

CIVIL NO. 2:19-CV-13202

## COMPLAINT

Plaintiff Jennifer E. Wheat asserts her causes of action against defendant Tangipahoa Parish School Board as follows:

### THE PARTIES

1.      Plaintiff is Dr. Jennifer E. Wheat, a person of age and majority, and a Louisiana citizen residing in the city of Amite within Tangipahoa Parish.

2.      Defendant is Tangipahoa Parish School Board (hereinafter "TPSB"), a statutorily created political subdivision and body corporate of the State of Louisiana.

### JURISDICTION AND VENUE

3.      The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. §§ 2000e-2 *et seq*. (Title VII) and 2000e-3 (retaliation), as more particularly set-out herein.

4.      The Court has personal jurisdiction over TPSB because it is a statutorily created political subdivision and body corporate of the State of Louisiana, present in all material respects within the Court's jurisdiction.

5.      Venue is proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3) (Title VII's venue provision) because (1) the unlawful employment practice alleged herein was committed in

Louisiana, (2) upon information and belief the employment records relevant to this action are found in this judicial district (specifically, Tangipahoa Parish), and (3) but for the unlawful employment practice, Ms. Wheat would have been employed in this district (specifically, Tangipahoa Parish).

## PROCEDURAL AND STATUTORY REQUIREMENTS

6.    At all relevant times, upon information and belief, TPSB employed more than 500 full-time employees.

7.    Beginning in 2007, TPSB hired Dr. Wheat as a teacher assigned to its Martha Vinyard Elementary School in Ponchatoula.

8.    Dr. Wheat remained continuously employed by TPSB until her constructive discharge on or about March 23, 2019.

9.    At the time of her constructive discharge, TPSB employed Dr. Wheat in the position of Assistant Principal of its Woodland Park Magnet school.

10.    On or about March 23, 2019 TPSB constructively discharged Dr. Wheat from her employment.

11.    On or about April 1, 2019, Dr. Wheat timely filed her Charge of Discrimination (EEOC No. 461-2019-00543) with the EEOC Field Office in New Orleans alleging that she was the victim of unlawful discrimination based on her sex as well as retaliation.

12.    The EEOC issued its Notice of Right to Sue letter to Dr. Wheat on July 22, 2019.

13.    Dr. Wheat timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

**FACTS**

**A.     The Plaintiff – Dr. Jennifer Wheat**

14.     Dr. Jennifer Wheat is a 44-year-old woman, doctor of education, and lifelong teacher and academic professional who lives in Amite, Louisiana with her husband and minor daughter.

15.     Dr. Wheat's daughter is a child who has special needs and requires individualized educational planning.

16.     Dr. Wheat also suffers from major depression, anxiety disorder, and related sequalae.

17.     Nevertheless, Dr. Wheat has spent her entire professional work-life as a successful educator and academic administrator, earning her master's degree and doctorate in educational fields.

**B.     The Defendant – Tangipahoa Parish School Board**

18.     TPSB is the statutorily created entity and public employer responsible for administering public education to the school children of Tangipahoa Parish.

19.     TPSB operates approximately 32 public schools.

20.     TPSB is organizationally structured with a "central office" that creates parish-wide policy and serves as the administrative headquarters of the TPSB school system.

21.     Each of TPSB's individual schools is locally administered by one or more principals and assistant principals (based on total student population).

22.     At all relevant times, TPSB maintained a human resources department and employed a director of human resources that served the needs of its school system and employees.

23.     Additionally, TPSB has a documented and long history of racially discriminatory hiring practices among its teachers.

24.     Since 1967, arising from the litigation *Moore v. Tangipahoa Parish School Board,* TPSB

has operated pursuant to a desegregation plan ordered by the United States District Court for the Eastern District of Louisiana.

25.     Pursuant to that desegregation plan, TPSB also employs a Chief Desegregation Implementation Officer tasked with ensuring that TPSB becomes fully compliant with the terms of the desegregation plan.

26.     At all relevant times in this case, TPSB's Chief Desegregation Implementation Officer was Rev. Andrew Jackson.

**C.     Dr. Wheat Complains about Sex-Based Harassment in the Workplace and TPSB Remedies the Situation by Transferring Dr. Wheat Rather Than Disciplining Her Harasser**

27.     For the greater part of the 2017-2018 school year, TPSB assigned Ms. Wheat as the assistant principal of Hammond West Side Montessori in Hammond, Louisiana.

28.     For the 2017-2018 school year, the principal of Hammond West Side Montessori (male, white) routinely engaged in hostile acts against Dr. Wheat in the workplace.

29.     Among other things, the principal frequently assigned Dr. Wheat janitorial work and other undesirable administrative tasks that would either not ordinarily be assigned to an assistant principal or were assigned for the purpose of harassing Dr. Wheat.

30.     Upon information and belief, the principal engaged in these actions because he held animus against Dr. Wheat based on her sex and sexual orientation (straight).

31.     During the 2017-2018 school year, Dr. Wheat complained about the principal's conduct to administrators at TPSB's central headquarters, specifically including Rev. Andrew Jackson and Assistant Superintendent Thomas Bellavia.

32.     Administration believed that Dr. Wheat was, in fact, being discriminated against or harassed based on her sex and sexual orientation, but declined to further investigate or discipline

the principal.

33.    Instead, TPSB determined to transfer Dr. Wheat to a new school for the 2018-2019 school year, and offered Dr. Wheat the choice to lateral to either Greenville Park Magnet School or D.C. Reeves Elementary School.

34.    Dr. Wheat contacted the principal of D.C. Reeves Elementary at the time, Reginald Elzy (male, black).

35.    During that conversation, Mr. Elzy indicated that he had accepted a lateral assigned to Woodland Park Magnet for the 2018-2019 school year, and invited Dr. Wheat to join him as his assistant principal.

36.    Dr. Wheat tentatively accepted, and TPSB administration, specifically Mr. Bellavia, approved Dr. Wheat's new assignment.

**D.    Dr. Elzy Has a Reputation for Engaging in Workplace Romantic Relationships and Tells Dr. Wheat He Expects Her to "Party" with Him after Work.**

37.    Dr. Wheat reported for duty at Woodland Park Magnet on or about July 27, 2018.

38.    In addition to recruiting Dr. Wheat as his assistant principal, Mr. Elzy also recruited a woman who, in this complaint, is referred to as "Jane Doe" (white) to serve as Lead Teacher.[1]

39.    The position of Lead Teacher is ordinarily responsible for supervising the work of all other teachers at a school, and reports to the assistant principal.

40.    Prior to the time that Dr. Wheat accepted Dr. Elzy's offer of recruitment and when she began work at Woodland Park Magnet, Dr. Wheat came to understand the conventional wisdom among her female co-workers within the TPSB school system that Mr. Elzy had a reputation for

---

[1] Plaintiff refers to the woman in question as "Jane Doe" to protect her identity in this public filing against the sensitive nature of the allegations, and because plaintiff is not brining a cause of action against her.

engaging in romantic relationships with his subordinates at the school's he administered.

41.     Dr. Wheat came to understand the conventional wisdom from her female co-workers that the women who submitted to Mr. Elzy's advances were rewarded with various perks, such as actual or de facto promotions, more desirable job assignments, and better quality of work-life.

42.     On or about July 26, 2018, the first day Dr. Wheat reported for duty at Woodland Park Magnet, Mr. Elzy had a private conversation with Dr. Wheat.

43.     During that private conversation, Mr. Elzy stressed to Dr. Wheat that he enjoyed going out and "partying" at night after work, and that he expected Dr. Wheat and his subordinates to join him, particularly for what Mr. Elzy referred to as the upcoming "hot August nights."

44.     Dr. Wheat understood Mr. Elzy's comments, tone, and mannerisms to mean that he expected Dr. Wheat to socialize with Mr. Elzy and others after work to the point of inappropriate excess.

45.     Dr. Wheat did not respond to Mr. Elzy's comments directly and instead attempted to re-direct the conversation to work matters.

46.     Upon recollection, during this conversation Mr. Elzy also communicated to Dr. Wheat that he intended to de facto promote Jane Doe as a second, assistant principal rather than lead teacher, despite the fact that ordinarily Woodland Park Magnet's student population did not warrant a second assistant principal.

**E.     Mr. Elzy Tells Dr. Wheat He Had Previously Found a Female Colleague's Buttocks "Sexy" and Distracting**

47.     At some point between July 27 and August 9, 2018, Mr. Elzy had a private conversation with Dr. Wheat concerning workplace professional attire at Woodland Park Magnet.

48.     Dr. Wheat shared her concern that dress policies needed to account for the fact that, for some women with larger frames, it can be difficult to find professional attire that fit properly.

49.     Mr. Elzy concurred and shared a story with Dr. Wheat concerning a former colleague whom Mr. Elzy found distracting because he found her buttocks to be particularly "sexy," and would not reprimand Dr. Wheat if she dressed for work in ways that accentuated her buttocks.

50.     Dr. Wheat did not know how to respond and attempted to move the conversation forward.

**F.     Mr. Elzy Makes Sexually Objectifying  and Degrading Comments to Dr. Wheat**

51.     On August 9, 2018, the first day of school, Mr. Elzy and Dr. Wheat were walking to the school cafeteria and Mr. Elzy began shaking his head at Dr. Wheat.

52.     Mr. Elzy looked at Dr. Wheat and said, to the best of Dr. Wheat's recollection, "girl, that booty! You need to do something with it!"

53.     Dr. Wheat understood Mr. Elzy's comments, tone, and mannerisms as sexually objectifying her while simultaneously degrading her appearance and professional attire in the workplace.

54.     Dr. Wheat again rebuffed the overture and told Dr. Elzy that she would change her clothes.

**G.     Mr. Elzy Publicly Reprimands Dr. Wheat Immediately after She Rebuffs His Advance**

55.     Immediately after Dr. Wheat rebuffed Mr. Elzy's advance, the two reported to a school-wide student and staff assembly for third through sixth grades for the beginning of the school year.

56.     During the assembly, Dr. Wheat checked her phone for any work messages.

57.     While Mr. Elzy was addressing the assembly, he noticed this and publicly yelled at and reprimanded Dr. Wheat in front of the entire student and staff population of the school.

58.     Dr. Wheat understood this as retaliation for her rebuffing Mr. Elzy's sexual compliment moments earlier in the cafeteria.

59.     As the assembly closed, Mr. Elzy, Dr. Wheat, and Ms. Doe stood at different exists and said goodbye to the students.

60.     Mr. Elzy chose to give each student a "high-five" as they exited, although Dr. Wheat and Ms. Doe did not.

61.     Mr. Elzy again reprimanded Dr. Wheat for not building relationships with the students, whereas Ms. Doe was not reprimanded.

**H.     Mr. Elzy Holds Dr. Wheat's Hands and Caresses Them until She Pulls Away**

62.     On or about August 14, 2018, Dr. Wheat had a private meeting Mr. Elzy to discuss various work matters.

63.     During the meeting Mr. Elzy again began to reprimand Dr. Wheat for various issues.

64.     Dr. Wheat defended herself but confided that she was under significant stress because of her special-needs daughter and health concerns of her own.

65.     Mr. Elzy apologized to Dr. Wheat and asked to hold her hands.

66.     Dr. Wheat submitted to the request because she presumed that Mr. Elzy was going to pray with her.

67.     Mr. Elzy held each of Dr. Wheat's hands and began caressing them with his thumbs for an inordinately long period time.

68.     Mr. Elzy did not pray with Dr. Wheat.

69.     Dr. Wheat then understood Mr. Elzy's physical touching as a sexually provocative overture.

70.     Dr. Wheat rebuffed the overture by pulling her hands back until Mr. Elzy released her.

**I.     Ms. Doe Tells Dr. Wheat that although Many People Likely Assume She Was Engaged in a Romantic Relationship with Dr. Elzy, She Was Not**

71.     Shortly after this interaction, Ms. Doe and Dr. Wheat had a private conversation.

72.     Ms. Doe indicated that many people believed that Mr. Elzy had a sexual relationship with one of his subordinates at his prior school, D.C. Reeves, and that many people likely suspected

that she and Mr. Elzy were currently engaged in a sexual relationship, but that this was not the case.

73.    Dr. Wheat did not know how to respond to this information and redirected the conversation elsewhere.

**J.    Mr. Elzy Began Referring to Ms. Doe as an Assistant Principal and Re-Assigning Dr. Wheat's Responsibilities to Ms. Doe**

74.    Organizationally, Dr. Wheat, as assistant principal, was responsible for various components of education, policy, and supervision for all grade levels at Woodland Park Magnet.

75.    However, Mr. Elzy re-assigned half of Dr. Wheat's duties to Ms. Doe, such that she was now directly responsible Ms. Wheat's former job duties with respects to third through sixth grades at the school, leaving Dr. Wheat with responsibility over only kindergarten through second grade.

76.    Mr. Elzy had also began referring to Ms. Doe as an assistant principal although organizationally she was assigned as Lead Teacher.

77.    Mr. Elzy ordered a new sign for Ms. Doe's dedicated parking spot at the school that read, either verbatim or to the effect, "Reserved for Assistant Principal."

78.    Upon information and belief, based upon Dr. Wheat's eyewitness observations of Mr. Elzy both with her and with Ms. Doe, Mr. Elzy retaliated against Dr. Wheat by further marginalizing her responsibilities and re-assigning them to Ms. Doe because Dr. Wheat rebuffed Mr. Elzy's multiple, sexually tinged advances to her.

79.    Upon information and belief, based upon Dr. Wheat's eyewitness observations of Mr. Elzy both with her and with Ms. Doe, Mr. Elzy rewarded Ms. Doe with the de facto promotion to assistant principal because Ms. Doe either submitted to or did not rebuff Mr. Elzy's likely advances towards her.

**K.    Dr. Wheat Complains to TPSB Administration, They Do Nothing in Response, and Mr. Elzy Further Retliates Against Dr. Wheat by Orchestrating a Truancy Determination against Dr. Wheat's Special-Needs Daughter**

80.    Dr. Wheat directly complained about Mr. Elzy's behavior, specifically including his sexually tinged and harassing comments and actions, to TPBS Administrator Rev. Andrew Jackson.

81.    To the best of her recollection, Dr. Wheat made her complaint to Rev. Jackson in August 2019 at some point after August 14, 2019, when Mr. Elzy insisted on caressing Dr. Wheat's hands.

82.    Upon information and belief, Rev. Jackson believed Dr. Wheat, but refused to further investigate or discipline Mr. Elzy because TPSB was concerned that any such actions against a principal, particularly principal who was black, might be construed negatively in the context of TPSB's ongoing efforts to reach full desegregation compliance.

83.    Dr. Wheat additionally complained about Mr. Elzy's inappropriate sexually harassing behavior to Allison Andrews, the Supervisor of Magnet Programs at TPSB, and at the time one of Mr. Elzy's evaluators.

84.    Upon information and belief, Ms. Andrews likewise believed Dr. Wheat, but likewise refused to further investigate or discipline Mr. Elzy.

85.    Upon information and belief, Mr. Elzy then learned about Dr. Wheat's complaints to TPSB administration and began to retaliate against Dr. Wheat.

86.    Primarily, Mr. Elzy retaliated against Dr. Wheat by ensuring that Dr. Wheat's special-needs daughter did not receive "homebound" educational status, and consequently was determined to be truant from Woodland Park Magnet school, resulting in significant negative consequences to Dr. Wheat and her family.

87.    By of background, Dr. Wheat's daughter suffers from medical and behavioral disorders.

88.     Ordinarily, Dr. Wheat's daughter would have been assigned to attend school, with or without an individualized educational plan, to Woodland Park Magnet.

89.     Dr. Wheat had previously advocated that TPSB decision-makers place Dr. Wheat's daughter on "homebound" status, which would have had the effect that Dr. Wheat's daughter would primarily stay at home to receive her education rather than attend daily classes at Woodland Park Magnet.

90.     In response, TPSB, and specifically Bess Kolwe, the TPSB District Homebound Coordinator, indicated to Dr. Wheat that her daughter would be or was approved for Homebound status in August 2019.

91.     However, upon information and belief, Mr. Elzy retaliated against Dr. Wheat both for rebuffing his sexually tinged advances, and also for complaining to TPSB administration regarding Mr. Elzy's sexually harassing behavior.

92.     Upon information and belief, Mr. Elzy persuaded TPSD administrators to reverse their prior decision and cancel Dr. Wheat's daughter's homebound status.

93.     The effect of this retaliation was that, without homebound status, Dr. Wheat's daughter was now technically truant from school for each day of the 2018-2019 school year she had missed.

94.     However, no one from TPSB administration alerted Dr. Wheat of this determination until September 14, 2019 when TPSB administrator, Cheryl Braud, emailed a formal letter to Dr. Wheat describing the issue.

95.     Upon receiving the notification, Dr. Wheat became immediately ill.

96.     Approximately 24 to 48 hours prior to receiving notification from TPSB, Dr. Wheat had learned that TPSB had reported Dr. Wheat's daughter as truant for every day of the 2019 school year, and had referred the case to Louisiana Families in Need of Services (FINS).

11

97.     Upon information and belief, but for Dr. Wheat rebuffing Mr. Elzy's prior sexually tinged advances, Mr. Elzy would not have encouraged or directed TPSB administrators to deny Dr. Wheat's daughter homebound status.

98.     Additionally or alternatively, but for Dr. Wheat engaging in the protected protest of complaining to TPSB administration about Mr. Elzy's sexual harassment, Mr. Elzy would not have encouraged or directed TPSB administrators to deny Dr. Wheat's daughter homebound status.

99.     Additionally or alternatively, but for Dr. Wheat engaging in the protected protest of complaining to TPSB administration about Mr. Elzy's sexual harassment, TPSB administration would not have denied Dr. Wheat's daughter homebound status.

**L.    The Aftermath – Dr. Wheat Suffers Extraordinary Mental and Physical Injury and Is Constructively Terminated**

100.    Dr. Wheat suffers from diagnosed depression, anxiety, irritable bowel syndrome, and post-traumatic stress disorder related to TPSB administration and Mr. Elzy's retaliation against Dr. Wheat as described throughout this lawsuit, specifically in the context of TPSB's treatment of Dr. Wheat's daughter.

101.    On September 14, 2019, Mr. Elzy's (and, alternatively, TPSB's retaliation) against Dr. Wheat and her daughter because of Dr. Wheat's prior rebuffing and protected protest caused immediate and extreme mental anguish which additionally manifested and caused physical injury.

102.    Dr. Wheat immediately took a medical leave of absence from work.

103.    Dr. Wheat was hospitalized on or about September 20, 2018 because of depression and suicidal ideation.

104.    Dr. Wheat remained hospitalized until on or about September 25, 2018.

105.    Dr. Wheat received permission from TPSB to extend her medical leave until her all her accrued medical and FMLA leave was exhausted in March 2019.

106.    During the intervening time period, TPSB failed to discipline or correct Mr. Elzy's unlawful workplace behavior.

107.    During the intervening time period, TPSB failed to protect Dr. Wheat from further unlawful workplace behavior from either TPSB itself or Mr. Elzy had Dr. Wheat returned to work.

108.    On or about December 2018, TPSB administration, specifically Assistant Superintended Ron Genco and Rev. Jackson met with Dr. Wheat and indicated, rather than to correct or discipline Mr. Elzy, that TPSB might be willing to again transfer Dr. Wheat to a new school.

109.    Dr. Wheat reasonably concluded that TPSB condoned unlawful sexual harassment in the workplace and refused to protect her from present or future harassment and retaliation.

110.    Accordingly, Dr. Wheat's working conditions at TPSB and Woodland Park Magnet had become completely and objectively intolerable such that no reasonable employee in Dr. Wheat's position could have continued working there.

111.    Accordingly, Dr. Wheat resigned her employment in constructive discharge in March 2019 after her medical leave had expired.

112.    The medical leave of absence and constructive discharge caused by TPSB and Mr. Elzy's unlawful actions financially crippled Dr. Wheat and her family and required her to cash out her state-provided pension at considerable financial loss.

113.    The mental and physical injuries caused by TPSB and Mr. Elzy's unlawful employment actions rendered Dr. Wheat disabled, and Dr. Wheat has since received social security disability status.

114.    Dr. Wheat has not found re-employment since her constructive discharge and is out significant lost past and future wages, including lost future pension benefits.

115.    Dr. Wheat has suffered out-of-pocket expenses because of TPSB and Mr. Elzy's unlawful

employment actions, including but not limited to the loss of fringe benefits and subsidized health insurance.

116.    Dr. Wheat suffered extraordinary mental anguish because of TPSB and Mr. Elzy's unlawful employment actions.

117.    Dr. wheat suffered physical pain, suffering, and injury because of TPSB and Mr. Elzy's unlawful employment actions.

## CAUSES OF ACTION

**A.    Unlawful Sex-Based Discrimination in the form of Quid-Pro-Quo Sexual Harassment and Retaliation in Violation of Title VII Against TPSB**

118.    Dr. Wheat states a cause of action of quid-pro-quo sexual harassment and related retaliation for rebuffing those sexual advances in violation of Title VII of the Civil Rights Act of 1964 against the Tangipahoa Parish School Board.

119.    Specifically, pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against any "individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. §2000e-2(a)(1). One particular form of sex-based discrimination is quid-pro-quo sexual harassment. 29 C.F.R. § 1604.11(a). When an employee rebuffs unwelcome sexual advances and suffers a tangible employment action, that employee states a claim for "quid pro quo" sexual harassment. *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000). Substantively, a plaintiff proves her prima facie case of quid-pro-quo sexual harassment by showing: "(1) the employee belongs to a protected group; (2) the employee is subjected to unwelcome harassment; (3) the harassment is based on sex; (4) the employee's refusal of the unwelcome harassment causes a tangible job detriment; and (5) there exists some ground to hold the employer liable." *House v. Interline Brands, Inc.*, 464 Fed. Appx. 402, 404 (5th Cir. 2012). A plaintiff who reasonably resigns her

employment in response to an "employer-sanctioned adverse action" states a claim for the tangible

employment action of constructive discharge. *Pennsylvania State Police v. Suders*, 542 U.S. 129

(2004).   A public employer who violates Title VII is liable for the victim's back wages, front

wages, reinstatement, statutory damages, reasonable attorney's fees, and litigation costs.

120.    In this case, the Tangipahoa Parish School Board had a history of implicitly condoning

sex-based discrimination by its principals against Dr. Wheat.   In order to solve Dr. Wheat's

complaint that the principal of Hammond West Side Montessori was discriminating against her,

TPSB simply transferred Dr. Wheat to a new school.   Dr. Wheat accepted transfer to Woodland

Park Magnet under the principalship of Reginald Elzy.   On the first day that Dr. Wheat reported

for duty, Mr. Elzy began making sexually tinged overtures to Dr. Wheat, including demanding that

she "party" with Dr Elzy; telling Dr. Wheat that Mr. Elzy was sexually distracted by co-workers

with large buttocks; that Dr. Wheat's buttocks were sexually attractive to Mr. Elzy; and insisting

that Dr. Wheat hold hands with Mr. Elzy while he caressed them.   Relatedly, upon information

and belief, Mr. Elzy had developed a reputation in the workplace of having romantic relationships

with his subordinates, and rewarding those subordinates with various favorable treatment.

121.    Dr. Wheat was not interested in Mr. Elzy's advanced and rebuffed them in each instance.

Dr. Wheat complained to at least two TPSB administrators about Mr. Elzy's sexual harassment,

including Rev. Andrew Jackson and Allison Andrews.   At no time did TPSB take steps to protect

Dr. Wheat from Mr. Elzy's harassment.   Instead, upon information and belief, Mr. Elzy learned of

Dr. Wheat's protected protests and retaliated against her by orchestrating the denial of homebound

status to Dr. Wheat's daughter, which had the effect of determining Dr. Wheat's daughter as truant

and referring Dr. Wheat and her family to Louisiana Families in Need of Services.   Alternatively,

Mr. Elzy retaliated against Dr. Wheat specifically for rebuffing his advances by orchestrating the

denial of homebound status to Dr. Wheat's daughter.

122.    These actions required official decision-making by TPSB and constituted tangible employment actions establishing TPSB's liability for it and its manager's quid-pro-quo sexual harassment.

123.    Mr. Elzy's harassment and retaliation caused Dr. Wheat immediate and profound mental anguish, physical injury, and post-traumatic stress disorder which ultimately resulted in her constructive discharge.

124.    At all times Mr. Elzy took these unlawful actions while employed as TPSB's principal of Woodland Park Magnet school and within the course and scope of his responsibilities.  At all times TPSB allowed Mr. Elzy to continue harassing and retaliating against Dr. Wheat despite her putting multiple TPSB administrators on notice of Mr. Elzy's harassing conduct.

125.    Accordingly, TPSB is liable to Dr. Wheat for Mr. Elzy's quid-pro-quo sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, and owes Dr. Wheat all statutory and equitable remedies, including her lost back wages, lost future wages, compensatory damages, statutory damages, and reasonable attorney's fees and litigation costs incurred in this matter.

**B.    Unlawful Sex-Based Discrimination in the form of Hostile Work Environment Sexual Harassment in Violation of Title VII Against TPSB**

126.    Dr. Wheat states a cause of action of hostile work environment sexual in violation of Title VII of the Civil Rights Act of 1964 against the Tangipahoa Parish School Board.

127.    Specifically, Title VII forbids an employer from discriminating against any employee on account of the person's sex.  42 U.S.C. §2000e-2(a)(1).  One form of sex discrimination prohibited under Title VII is the creation of a hostile work environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  To prove a prima facie case of hostile work environment based on sexual

harassment, a plaintiff must show "(1) she is member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a 'term, condition, or privilege' of [her] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).  A work environment is unlawfully severe or pervasive when "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004).  A public employer who violates Title VII is liable for the victim's back wages, front wages, reinstatement, statutory damages, reasonable attorney's fees, and litigation costs.

128.    In this case, as alleged throughout this complaint, Reginald Elzy began making sexually tinged overtures to Dr. Wheat from the first day she reported for duty at Woodland Park Magnet school.  When Dr. Wheat rebuffed Mr. Elzy's advances, he first publicly ridiculed her in the work environment, then began marginalizing Dr. Wheat's responsibilities as assistant principal in favor of Jane Doe who, upon information and belief, had not rebuffed Mr. Elzy's likely advances.  Eventually, Mr. Elzy retaliated against Dr. Wheat by orchestrating the denial of homebound status to Dr. Wheat's daughter, causing Dr. Wheat immediate and profound mental anguish, physical injury, and post-traumatic stress disorder.  Throughout this entire time period, Dr. Wheat had reported Mr. Elzy's misconduct to TPSB administrators who failed to discipline Mr. Elzy or protect Dr. Wheat.  In the face of these intolerable working conditions, Dr. Wheat resigned in constructive discharge.

129.    At all times Mr. Elzy took these unlawful actions while employed as TPSB's principal of Woodland Park Magnet school and within the course and scope of his responsibilities.  At all times

TPSB allowed Mr. Elzy to continue harassing and retaliating against Dr. Wheat despite her putting multiple TPSB administrators on notice of Mr. Elzy's harassing conduct.

130.    Accordingly, TPSB is liable to Dr. Wheat for Mr. Elzy's hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, and owes Dr. Wheat all statutory and equitable remedies, including her lost back wages, lost future wages, compensatory damages, statutory damages, and reasonable attorney's fees and litigation costs incurred in this matter.

**C.    Unlawful Retaliation in Violation of Title VII Against TPSB**

131.    Dr. Wheat states a cause of action of unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 against the Tangipahoa Parish School Board.

132.    Pursuant to Title VII, an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. §2000e-3(a).  In a retaliation case, "an adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation."  *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).  Just as in a Title VII discrimination case, an employer remains vicariously liable for the acts of its decision-maker when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action.  *See e.g., Flanagan v. Aaron E. Henry Cmty.*

*Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).  A public employer who violates Title VII is liable for the victim's back wages, front wages, reinstatement, statutory damages, attorney's fees, and litigation costs.

133.    In this case, as alleged throughout this complaint, Reginald Elzy began making sexually tinged overtures to Dr. Wheat from the first day she reported for duty at Woodland Park Magnet school.  When Dr. Wheat rebuffed Mr. Elzy's advances, he first publicly ridiculed her in the work environment, then began marginalizing Dr. Wheat's responsibilities as assistant principal in favor of Jane Doe who, upon information and belief, had not rebuffed Mr. Elzy's likely advances.  Dr. Wheat complained to TPSB administrators on at least two occasions almost immediately after Mr. Elzy began engaging in his harassing behavior, first to Rev. Jackson around mid-August 2018, and then again to Ms. Andrews in early September 2018.  Almost immediately thereafter, Mr. Elzy, or TPSB administrators, or both, retaliated against Dr. Wheat by orchestrating the denial of homebound status to Dr. Wheat's daughter, causing Dr. Wheat immediate and profound mental anguish, physical injury, and post-traumatic stress disorder.  Upon information and belief, these actions were taken specifically to punish Dr. Wheat for complaining about Mr. Elzy's behavior.  Indeed, at no point during the remainder of Dr. Wheat's employment does it appear that TPSB ever fully investigated her complaint regarding Mr. Elzy's harassing behavior or disciplined him for his misconduct.  Later, shortly before her constructive discharge, TPSB administrators suggested that they simply move Dr. Wheat to yet another school rather than hold Mr. Elzy accountable for his actions.  Faced with this intolerable working environment, Dr. Wheat resigned in constructive discharge.

134.    At all times Mr. Elzy and other TPSB administrators took these unlawful actions while employed as TPSB's principal or executives and within the course and scope of their

responsibilities.  At all times TPSB allowed Mr. Elzy to continue harassing and retaliating against Dr. Wheat despite her putting multiple TPSB administrators on notice of Mr. Elzy's harassing conduct.  Alternatively, at all times TPSB itself, through its executives and administrators, retaliated directly against Dr. Wheat.

135.    Accordingly, TPSB is liable to Dr. Wheat for it and Mr. Elzy's retaliation in violation of Title VII of the Civil Rights Act of 1964, and owes Dr. Wheat all statutory and equitable remedies, including her lost back wages, lost future wages, compensatory damages, statutory damages, and reasonable attorney's fees and litigation costs incurred in this matter.

**JURY DEMAND**

Dr. Wheat requests a trial by jury on all issues and causes of action.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Jennifer E. Wheat prays that this complaint be deemed good and sufficient; that it and summons be served upon defendant Tangipahoa Parish School Board; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant for all damages and equitable relief due to plaintiff, including lost back wages, lost future wages, compensatory damages, statutory damages, litigation costs, reasonable attorney's fees, and legal interest from the date of demand, and for all other general and equitable relief to which plaintiff is entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email: vogeltanz@gmail.com
*Counsel for Jennifer Wheat*

**Clerk of Court:**
**Please hold summons pending attempt to secure waiver of service**